IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS VILLALTA, et al.,<br><br>            Plaintiffs,<br><br>    v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, et al.,<br><br>            Defendants.<br>_____/ | No. C 08-4958 CRB<br><br>**ORDER GRANTING SUMMARY JUDGMENT** |

  Plaintiffs Carlos Villalta, Anthony Padilla, Gilbert Guerra, and Daniel Perez, allege that Defendant City & County of San Francisco ("CCSF") discriminated against them because of their ethnicity. While the Complaint itself is not entirely clear, Plaintiffs argue in their moving papers that CCSF denied them promotions, access to the tools of their trade, and in one case fired an individual, all because of their ethnic origin. In October of 2007, Plaintiffs filed complaints with the EEOC. In July of 2008, Plaintiffs obtained right to sue letters.

  Defendant argues that, as to some Plaintiffs, they fail to make a prima facie case of discrimination, and as to others that they fail to present evidence that rebuts CCSF's legitimate non-discriminatory motivation for its actions. CCSF argues that these Plaintiffs had ongoing performance problems that justified both the decision not to promote Plaintiffs

and, in one case, the decision to terminate a Plaintiff.

For the reasons that follow, Defendant's motion for summary judgment is GRANTED. Plaintiff presents nothing more than weak circumstantial evidence that cannot rebut Defendant's evidence of legitimate, non-discriminatory reasons for its actions. Under the McDonnell Douglas framework, Plaintiffs must present "specific and substantial" evidence to rebut such non-discriminatory justifications. Plaintiffs have failed to do so, and therefore no reasonable jury could find in their favor.

## BACKGROUND

Plaintiffs are three current employees and one former employee of the Sign Shop of the San Francisco Municipal Transportation Agency. The following individuals have supervisory roles in the Sign Shop, and to one extent or another, Plaintiffs allege that they were involved in discriminatory behavior in the Sign Shop:

1. The Sign Shop is managed by Antoinette Coe, who is Hispanic. Coe has managed the Sign Shop since November of 2005. Coe Decl. ¶ 2. She was promoted in January of 2008 to Manager of Field Operations, but continues to oversee the Sign Shop. Id. ¶ 18.

2. Karen Siu is a management assistant in the sign shop. Sui Decl. ¶ 1. In 2007, Siu was assigned the duty of supervising two clerical staff members at the sign shop, one of whom is Plaintiff Gilbert Guerra. Id. ¶ 2.

3. Noel Laffey is a Traffic Sign Supervisor in the MTA Sign Shop, where he supervises and coordinates the work of three surveyors and seven sign installers. Laffey Decl. ¶ 2. Laffey is a supervisor for Plaintiff Padilla.

4. John Grey, like Laffey, is a Traffic Sign Supervisor. He has held his current position since 1999. Grey was responsible for supervising Plaintiffs Daniel Perez and Carlos Villalta.

Because the allegedly discriminatory conduct was different with regard to certain Plaintiffs, this order will outline the facts that a relevant to separate claims in separate sections.

//

2

1. **Plaintiff Gilbert Guerra**

Plaintiff Guerra has worked in the sign shop as a Senior Clerk Typist since 1999. Guerra identifies himself as a gay U.S. national of Hispanic origin. Ofierski Decl. ex. A, at 25:6, 152:24-25.

Guerra's claims revolve around his treatment by Karen Siu. In October of 2007, Siu prepared a performance evaluation that rated Guerra's overall job performance as "Met Expectations." Siu Decl. ¶¶ 3-4. However, Siu rated Guerra as "Did not Fully Meet Objective" in three categories. Id. In 2008, Siu prepared another evaluation that again rated Guerra's performance as "Met Expectations." In this evaluation, Siu rated Guerra as "Did Not Fully Meet the Objective" in three categories, and "Did Not Meet Objective" in one category. Siu explains in her declaration that she gave Guerra these ratings because he continued to enter information into the shop database despite being told not to. Siu also notes that Guerra was often tardy, and that he combined sick days with regular days off, which violated MTA's attendance policy. Id. ¶ 5, id. ex. B.

Guerra argues that he was subjected to retaliation both after filing a charge of discrimination and after filing a claim with the San Francisco Attorney's office alleging he worked in a hostile work environment. This relation consisted of Guerra being "denied access to the most important element of his job, [the] AS 300 database," and that as a result he was not able to perform his duties. Opp. at 15. Guerra also alleges that he was required to ask permission before using the office copier. Guerra further notes that he was transferred out of the sign shop in late February of 2010. Id. at 16.

2. **Plaintiff Daniel Perez**

Perez worked in the sign shop from 2000 to October of 2007, when he was fired. Ofierski Decl. ex. B, 10:8-11:8. Perez identifies himself as Hispanic. Id. at 39:9.

In September of 2005, Perez's supervisor, John Grey, gave him a verbal warning for going home during work house and failing to follow Grey's instructions. Grey had personally observed Perez's city-owned truck parked near Perez's house during work hours for an extended period of time. Grey Decl. ¶ 3. In August of 2006, the City whistleblower

3

1  hotline received a tip that a city truck was often parked in a residential neighborhood during
2  work hours. After determining that the truck was assigned to Perez, MTA placed a GPS
3  device on the truck. The investigation revealed that Perez regularly went home for periods
4  ranging from minutes to hours, and that Perez routinely falsified his daily work reports to
5  conceal his conduct. Coe Decl. ¶ 8, exs A & B. Perez was fired.

6  Perez argues that MTA did not employ "progressive discipline" before firing him, and
7  that this was done because he is Hispanic. Perez argues that he was entitled to a counseling
8  report, a written warning, and suspension, all before he could be terminated.

9  3.  **Plaintiff Carlos Villalta**

10  Plaintiff Villalta has worked in the sign shop since 1991, and identifies as a Hispanic
11  native of El Salvador. Ofierski Decl ex. D, at 15:10-16:5; 16:13-18:21; 13:22. In August of
12  2006, Villalta was suspended for falsifying work reports. Coe Decl. ¶ 15, ex. H. In October
13  of 2006, Supervisor Coe spoke with Villalta regarding his tardiness, low productivity, and
14  other performance issues. A written reports reflects the substance of this conversation. Id. ¶
15  16, ex. I. In September of 2007, Coe recommended that Villalta be suspended for low
16  productivity, failure to submit accurate work reports, and failing to follow work orders. Id. ¶
17  17, ex. J.

18  Villalta makes a variety of arguments regarding alleged discrimination. These
19  arguments center around MTA's failure to promote him. He argues that the Sign Shop had a
20  de facto "grooming" program in which Caucasian employees were given the experience
21  necessary to be promoted. Specifically, Villalta argues that two Caucasian females, Edith
22  Stonewalsh and Margaret McFadden, were given preferential "light duty" assignments.
23  Villalta Decl. ¶ 5. During such an assignment, these individuals "were given access to
24  computer databases and processed traffic surveyor work orders; these important experiences
25  were otherwise denied to Mr. Padilla and Mr. Villalta." Opp. at 7.

26  Villalta also argues that the hiring process for a traffic supervisor position in 2008 was
27  "a discriminatory sham." Opp. at 13. Villalta notes that he was given a raw score of 955.9,
28  which was higher than the eventually successful candidate Edith Stonewalsh's 953.2. Ramos

4

Decl., ex. V. Villalta also argues that MTA's discriminatory intent is evidenced by its decision to permit the ultimately successful candidate to take the examination on a different day.

4. **Plaintiff Anthony Padilla**

Plaintiff Padilla also has a history of disciplinary actions. Since February of 2007, Padilla has been disciplined three times. Supervisor Coe reprimanded him for logging too many miles on his truck, and the MTA later suspended Padilla after his supervisor discovered that he used his City truck to transport tile for personal use. In June of 2008, the MTA suspended him again for failing to follow his supervisor's instructions. Coe Decl. ¶¶ 12-13; exs F & G; Laffey Decl. ¶¶ 4-5; exs. B&C.

Like Villalta, Padilla also applied for a surveyor job in 2008. His arguments on this issue mirror Villalta's. Padilla also argues that he was forbidden from doing "light duty," while that accommodation was made for preferred Caucasian employees. Again, his arguments mirror Villalta's.

Finally, Padilla argues that his disciplinary history reflects "disciplinary stacking." However, Padilla's support for this claim is somewhat garbled. First, he appears to argue that he was disciplined for installing a particular sign at a "45% angle," Opp. at 6, even though such an infraction would not have subjected a non-Hispanic employee to discipline. Padilla then goes on to list a variety of other disciplinary actions taken against Padilla, for infractions such as "not breaking up aluminum materials, misplacing his keys, leaving lights on in his vehicle, unnecessary comments in his work logs, lunch time to be complete by on p.m., inappropriate use of a radio for stating the mistakes of a traffic surveyor over the radio, spitting, personal property in a city vehicle." Opp. at 7. While it is not entirely clear, Padilla seems to suggest that these "actions" – which appear simply to be a Supervisor's logs – reflect that Padilla was disciplined unfairly.

//
//
//

5

**DISCUSSION**

**I.      Legal Standard**

A principal purpose of the summary judgment procedure is to isolate and dispose of factually unsupported claims. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). A party moving for summary judgment that does not have the ultimate burden of persuasion at trial (usually the defendant) has the initial burden of producing evidence negating an essential element of the non-moving party's claims *or* showing that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party does not satisfy its initial burden, the non-moving party has no obligation to produce anything and summary judgment must be denied. If, on the other hand, the moving party has satisfied its initial burden of production, then the non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. Nissan Fire & Marine Ins. Co., 210 F.3d at 1102. A genuine issue of fact is one that could reasonably be resolved in favor of either party. A dispute is "material" only if it could affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

In determining whether to grant or deny summary judgment, it is not a court's task "to scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal quotations omitted). Rather, a court is entitled to rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment. See id. However, "a conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." F.T.C. v. Publishing Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997).

**A.      Discrimination and Retaliation**

6

In order to prevail in a Title VII disparate treatment case, a plaintiff must first establish a prima facie case of discrimination. In particular, a plaintiff must show that (1) he belongs to a protected class, (2) he was performing competently, (3) he was subjected to an adverse employment action, and (4) he was similarly situated to individuals outside the protected class who were treated more favorably. See Aragon v. Republic Silver State Disposal Co., 292 F.3d 654, 658 (9th Cir. 2002). If a plaintiff succeeds in establishing a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. If the defendant does so, the plaintiff must demonstrate that the defendant's articulated reason is a pretext for unlawful discrimination "by either directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Id. (internal quotation marks and citations omitted). Such evidence "must be both *specific and substantial* to overcome the legitimate reasons put forth by" the defendant. Id.

A plaintiff can establish a prima facie case of retaliation by showing that: (1) he engaged in a protected activity; (2) he suffered an adverse employment decision; and (3) there was a causal link between the protected activity and the adverse employment decision. See Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1064 (9th Cir. 2002). To establish causation, the plaintiff must show by a preponderance of the evidence that engaging in the protected activity was one of the reasons for the adverse employment decision and that but for such activity the decision would not have been made. See id. The same burden-shifting analysis for discrimination is done for claims of retaliation.

If a defendant carries its burden, a plaintiff must demonstrate that the "'assigned reason' was 'a pretext or discriminatory in its application.'" Lynn v. Regents of the Univ. of California, 656 F.2d 1337, 1341 (9th Cir. 1981) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 807 (1973)). Pretext may be shown either (1) directly showing that a discriminatory motive more likely than not motivated the employer or (2) indirectly by showing that the employer's proffered explanation is unworthy of credence. Godwin v. Hunt

Wesson Inc., 150 F.3d 1217, 1220 ( 9th Cir. 1998). To establish pretext, "very little" direct evidence of discriminatory motive is required, but if circumstantial evidence is offered, such evidence has to be "specific" and "substantial." Id. at 1222; Little v. Windermere Relocation, Inc., 265 F.3d 903, 915 (9th Cir. 2001).

The burden shifting analysis of McDonnel Douglas permits summary adjudication where a Plaintiff fails to present evidence that an employer's allegedly nondiscriminatory justification was pretextual. Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018, 1028 (9th Cir. 2006) (stating that, on a motion for summary judgment, once a defendant offers a legitimate, nondiscriminatory reason for the allegedly discriminatory act, the presumption of discrimination disappears, and the plaintiff must offer evidence that the reason is a pretext for discrimination).

## II. Plaintiffs fail to identify a material issue of fact

Defendant's evidence is sufficient to shift the burden to Plaintiffs, requiring them to make a prima facie case of discrimination. Even where Plaintiffs are capable of making this case, Defendant clearly articulates a legitimate and non-discriminatory reason for its actions. Plaintiffs, on the other hand, have no direct evidence of discrimination, and rely instead on speculative and unpersuasive circumstantial evidence. Plaintiff can point to no evidence that qualifies as the "specific and substantial" circumstantial evidence that is necessary to rebut a showing that the employer acted for legitimate reasons. Therefore, summary judgment must be GRANTED in Defendant's favor.

### A. Guerra

As noted above, Plaintiffs' opposition papers argue that Guerra was retaliated against for sending a letter to the San Francisco City Attorney's office as a condition precedent to filing a lawsuit based on hostile work environment. See Ramos Decl. ex. E. Guerra also argues that he was retaliated against for filing a charge of discrimination against MTA in 2007. However, Guerra fails to cite evidence of any such charge.

Nevertheless, even assuming the facts are as Guerra claims, he fails to establish a prima facie case of discrimination. As explained above, in order to establish such a case, a

8

plaintiff must have evidence of an adverse employment action. Guerra has no such evidence. On the contrary, Guerra submits evidence of only two employer actions: (1) Guerra was denied access to a database he had previously worked with, see Ramos 2d Decl. ex. E, and (2) Guerra was told to obtain permission before using the copier. These are not adverse actions. As to the first, the evidence merely reflects the fact that Guerra was instructed not to make entries into the database because his supervisors concluded he was entering errors that confused other employees. See Siu Decl. ¶ 5. There is no evidence to support the claim that use of this database was "the most important element of his job." On the contrary, the decision to deny him access to the database had the effect of simply changing his job. There is no evidence that Guerra was paid less, or was even reviewed in a more critical manner as a result of his inability to use the database. Just because Guerra preferred to work with the database does not mean he was entitled to do so. Therefore, there is no evidence that this instruction constitutes an adverse employment action

The same is true with regard to Guerra's claim that he was told to ask permission before using the copying machine. As an initial matter, the record reflects that both individuals supervised by Liu were subjected to the same restriction. Ramos Decl. ex. H. Therefore, there is no evidence that Guerra was treated different because of his ethnicity, which is a required element of the prima facie case. Furthermore, the record only reflects that Guerra was told to ask permission to use the copier, not that he was ever denied permission in a way that affected his work. On the contrary, the record reflects that Guerra's supervisor was concerned about wasting paper on non-work-related matters. There is nothing in the record to suggest that work-related copying was in any way curtailed.

Because Plaintiff Guerra has not made a prima facie case of discrimination, a reasonable jury could not find in his favor. Therefore, Defendant is entitled to summary judgment as to his claims.

**B.    Perez**

As noted above, Plaintiff Perez was fired in October of 2007. He argues that his termination was discriminatory as he was not given "progressive discipline." While

9

Plaintiffs' opposition argues that he was entitled to "progressive discipline," the evidence submitted does not support that assertion. First, Plaintiffs argue that progressive discipline consists of a counseling report and a written warning, and cite to Supervisor Laffey's deposition testimony. However, Laffey testified that only that <u>he</u> "generally write[s]" a counseling report, and that a counseling report is typically followed by a written warning. Ramos 2d Decl. ex. B. There is no evidence that this procedure is mandated by MTA in all cases. Plaintiffs also seem to suggest that "progressive discipline" requires that an employee be suspended before being terminated. Once again, however, Plaintiffs cite only to Laffey's deposition testimony about the typical progression of a disciplinary action. There is no evidence that this progression is necessary even when, as is undisputed in Perez's case, an employee has committed gross misconduct. Finally, Plaintiffs argue that a non-Hispanic employee would have been given a "Last Chance Agreement." Once again, however, Plaintiffs only provide evidence that Last Chance Agreements are <u>sometimes</u> used, not that an employee is entitled to one. Moreover, the example Last Chance Agreement submitted into evidence does not list the ethnicity of the employee or the specifics of the misconduct. Therefore, it is impossible to conclude that (1) Hispanic employees are not given such agreements, or (2) that such agreements are available even for misconduct similar to Perez's. Plaintiffs' arguments to the contrary are simply speculation.

Even assuming without deciding that Plaintiff Perez has succeeded in presenting sufficient circumstantial evidence to establish a prima facie case of discrimination, Defendant has ample evidence showing its legitimate and non-discriminatory reasons for firing Perez. He repeatedly went home instead of working and lied to cover it up. Plaintiff fails to meet its burden of presenting "specific and substantial" evidence showing this justification to be a pretext.

### C. Carlos Villalta

As noted above, the arguments made and the evidence offered by Villalta reflect the contention that Defendant failed to promote Villalta for discriminatory reasons. In particular, Villalta argues that (1) he was not permitted to take part in a "grooming" program, and (2)

10

1    that he was not given a promotion in 2008 despite his having received the highest "raw
2    score" on an examination. Even assuming Villalta has established a prima facie case of
3    discrimination, he cannot rebut the City's evidence of a non-discriminatory reason for its
4    actions. The individual who was ultimately promoted – and who was allegedly "groomed"
5    for the position – also scored very high on the test. There is also ample evidence of Villalta's
6    history of disciplinary problems, and it is entirely reasonable for the city to promote someone
7    with a slightly lower "raw" score who has no comparable history of misconduct, particularly
8    when the record is devoid of evidence explaining the significance of a "raw score." The
9    record also reflects the fact that Villalta was interviewed by an independent panel of racially
10   diverse individuals, and that this panel rated the successful candidate as better qualified than
11   Villalta.

12        Plaintiffs contend that there are "disputed material facts regarding 'light duty' in the
13   office." Opp. at 7. In particular, Plaintiffs contend that "Mr. Laffey the sign shop supervisor
14   gave preferential 'light duty' assignments to two Caucasian females, Edith Stonewalsh . . .
15   and Margaret McFadden . . . within the sign shop office, while denying the same opportunity
16   to . . . Mr. Villalta." Id. Plaintiffs contend that this "light duty" assignment permitted the
17   Caucasian employees to gain advantages that strengthened their applications for future
18   supervisory positions. This is so, the argument goes, because their assignments permitted
19   them to learn how to work with an important database that is used by supervisors.

20        Plaintiff Villalta fails to present evidentiary support for his contentions. As an initial
21   matter, Plaintiff's accusation that Coe perjured herself in her declaration is entirely
22   overblown. As Villalta notes, Coe averred in her first declaration that "the sign shop never
23   had any 'light duty' assignments. Shop workers who were medically unable to perform their
24   regular duties were assigned to positions elsewhere in the MTA. These assignments were
25   determined by an MTA personnel unit outside the sign shop." Coe Decl. ¶ 14. Plaintiffs
26   argue that this is incompatible with Laffey's testimony that Ms. Stonewalsh worked on light
27   duty while assigned to him. See Opp. at 9. However, as Coe clarifies in her supplemental
28   affidavit, it is possible that Stonewalsh received an appropriate accommodation by MTA

11

itself, rather than from anybody within the sign shop. Indeed, Plaintiffs have no evidence that anybody within the sign shop made the decision to give Stonewalsh "light duty."

In any event, this debate is a sideshow: Plaintiff has no evidence that this "light duty" assignment in fact constituted a benefit to Stonewalsh or any other Caucasian employee. Without such a showing, Plaintiffs fail to make a prima facie case of discrimination, which requires an adverse employment action. Plaintiffs note that Stonewalsh and others learned to use the AS-400 database while on light duty. Plaintiffs further note that surveyors also use the AS-400 database. Therefore, they argue that an applicant who is familiar with the AS-400 database would have an advantage when applying for a supervisory position. However, there is no evidence to support this. First, it is clear from the record that a variety of non-supervisory individuals used the AS-400 system, including Plaintiff Guerra. Second, there is no evidence that any of the qualifications necessary to be promoted, or any of the examinations administered, made any reference whatsoever to the AS-400 system. Plaintiffs' only citation to the record on this count is to Stonewalsh's written application for the position, in which she explains that she is familiar with the AS-400 system. There is no evidence that anybody involved in hiring for the open position placed any weight whatsoever on such experience. None of the documents submitted by either party concerning the application process and the decisions made by the managers made any reference to the AS-400 database.

In any event, the gravamen of Villalta's complaint is the fact that he was not ultimately promoted. He argues that Caucasian applicants were "groomed" for the position, and were eventually given that position at the expense of better qualified Hispanic employees. However, Defendant has presented evidence of legitimate non-discriminatory reasons for declining to promote Villalta. While Plaintiffs are correct that Villalta had a higher "raw" score in the 2008 hiring process than did Stonewalsh, they fail to note that the same document assigns both candidates identical ranks and "Grouping Final Scores." Moreover, Defendant proffers evidence that an independent interviewing panel reviewed all applicants, and rated Stonewalsh higher than Villalta. See Fieldsted Supp. Decl. ex. A.

12

Manager Coe also explains that, when choosing between Ms. Stonewalsh and Mr. Villalta, she chose Stonewalsh because "Mr. Villalta . . . had performance records that were problematic." Coe Decl. ¶ 20. Villalta does not dispute the nature of his performance reviews. Finally, it should be noted that one of the three interviewers was Hispanic, Supervisor Coe is Hispanic, and one of the ultimately successful candidates was Hispanic. Fieldsted Supp. Decl. ¶ 2; Molina Decl. ¶ 2. All this undermines any conclusion that the process was biased against Hispanic applicants.

All this evidence strongly supports the conclusion that Defendant had a legitimate and non-discriminatory reason for promoting Stonewalsh instead of Villalta. None of Plaintiff's evidence amounts to "specific and substantial" evidence that could justify a finding that Defendant's rational was a mere pretext. Plaintiff presents only speculative circumstantial evidence, and under the McDonnell Douglas standard, he cannot prevail.

### C. Plaintiff Anthony Padilla

Padilla makes claims similar to Villalta's. They fail for the same reasons. First, as to the allegedly discriminatory "light duty" assignments, Padilla has no evidence that this assignment constitutes an adverse employment action, or that these assignments were initiated by Sign Shop supervisors, or that they gave certain individuals an advantage in promotions. As with Villalta, his arguments are based on speculation, not evidence. As to the failure to promote Padilla, this argument fails for the same reason as Villalta's, only more so. Padilla's examination score was lower than Villalta's and Stonewalsh's, and hence has a weaker claim as to his qualifications for the position. And in any event, it is undisputed that Padilla has a history of disciplinary problems. There is no evidence in the record that Stonewalsh, the ultimately successful candidate, had any comparable history. Hence, even assuming a prima facie case has been made, Padilla fails to rebut Defendant's showing that it acted for legitimate non-discriminatory reasons. Padilla has no "specific and substantial" evidence that those reasons are merely a pretext.

Padilla's one independent argument concerns "disciplinary stacking." While this argument is not well explained in Plaintiffs' papers, it appears to concern the fact that Padilla

13

was once disciplined for inappropriately installing a parking regulation sign. Padilla explains that he was disciplined because he installed a parking sign at a 45-degree angle, and points to Laffey's deposition testimony that no other employee had been disciplined for such a mistake. This argument is unpersuasive for many reasons. First, there is no evidence that any other employee made this kind of mistake, and so Laffey's failure to point to another incident of similar discipline is not probative. Second, Padilla asks for "judicial notice" of the fact that "most traffic and parking signs in San Francisco are in fact installed at a 45% angle." This request is inappropriate. Padilla cites to no evidence supporting this proposition, let alone evidence that satisfies the standard for judicial notice. In any event, even if Padilla is correct, this fact is irrelevant. The record reflects the fact that the discipline occurred only after Laffey told Padilla to fix an error, and Padilla failed to do so. See Laffey Decl. ex. C. Padilla's citation to other disciplinary actions similarly fails to reflect any disciplinary stacking. Padilla merely lists a variety of infractions for which he was disciplined, apparently suggesting that such a long list permits the inference that Padilla was somehow disciplined too frequently. Such an inference, however, would be purely speculative. It is equally possible that Padilla committed a long list of infractions, and was appropriately disciplined for them. Given this reliance on speculation, Padilla fails to make a prima facie case as to discrimination under Title VII.

### D. Other Evidence

Plaintiffs also cite to certain evidence that is not tied to any particular Plaintiff's specific claim. Plaintiffs argue that this evidence reflects a generally anti-Hispanic attitude in the Sign Shop, and that it supports their claims. Once again, this evidence is either pure speculation, or is insufficient to rebut Defendant's showing under the McDonnell Douglas standard.

#### 1. Unfair Discipline

Plaintiffs argue in their opposition that "[o]nly Hispanics and African Americans have been subject to disciplinary suspensions and termination within the sign shop, in comparison, Caucasian and Asian sign installers have received much less severe written warning for

14

similar offenses." Opp. at 4. Plaintiffs' brief includes a chart that allegedly reflects this disparity. The chart lists the ethnicity of a worker, his or her position, the subject matter of the disciplinary action, and the punishment. This chart allegedly reflects the fact that for certain categories of misconduct, such as "excessive miles" or "inattention to duty," Caucasian and Asian-American workers received more lenient punishment. This chart is immaterial for a variety of reasons. First, there is no citation to evidence supporting these claims. Argument is not evidence, and cannot defeat a motion for summary judgment. Second, the information reflected in the chart is so general as to be useless. The category of "inattention to duty" could include a variety of different types of misconduct that merit different disciplinary penalties. Surreptitiously leaving work for multiple hours a day might be one form of inattention, and briefly dozing off at one's desk might be another. There is no reason to conclude that both forms of misconduct merit identical responses. The chart simply does not reflect these sorts of details, and without these details it is impossible to conclude whether or not the discipline was unfair.

### 2. Failure to promote Hispanics

Plaintiffs argue that "[n]o Hispanic sign installer from the sign shop has ever been promoted to the next level of traffic surveyor technician." Opp. at 1. Once again, Plaintiffs fail to submit evidence supporting this claim. Even assuming its veracity, however, other evidence entirely undermines the probative value of this fact. First, while no sign installer has been <u>promoted</u> to supervisor, it is undisputed that the manager of the Sign Shop is herself Hispanic. The relevant question under Title VII is whether there is anti-Hispanic bias, and the fact that a Hispanic manager is hired from the outside, as opposed to promoted from within, undermines any argument that hiring is racially motivated. Second, Plaintiffs ignore the nature of the hiring process within MTA. According to the evidence presented by Defendant - and undisputed by Plaintiffs - MTA hires for a variety of surveyor positions in different subsections of MTA. The Sign Shop is only one of these subsections, but the MTA's hiring process fills surveyor positions in different subsections through the same process. The record reflects that the MTA has indeed promoted Hispanic individuals to a

15

surveyor position, just not within the Sign Shop. For instance, in 2008 MTA promoted a Hispanic applicant to a surveyor position in the Customer Service unit. See Fieldstd Decl. ex. A; Molina Decl. ¶ 2.

### 3. Procedural Irregularities in the 2008 Hiring Process

Plaintiffs also argue that certain procedural irregularities in the hiring process reflect the anti-Hispanic bias of the Sign Shop's management. This is not the case. First of all, as a threshold issue, Plaintiffs' evidence does not establish the existence of procedural irregularities. Plaintiffs argue that "the MTA conflated two distinct classes of surveyor, Citations and Sign Shop in order to formulate what can only be described as a fictitious list of persons eligible for the three traffic survey positions because prior to the formulation of that list, designed to mask the fact that the divisions had already designated the real pool of candidates, in the sign shop's case no Hispanics." Opp. at 13. This sentence is alternatively non-sensical and unsupported by the evidence. There is no evidence that such a "conflation" is in any way irregular, no evidence that "the divisions" had already decided on their pools of candidates, and no evidence that the "list" in question was in any way "fictitious." While Plaintiffs cite to evidence that the qualifications for Citations surveyors were somehow difference from the qualifications for Sign Shop surveyors, this does not in any way support the inference that the process was irregular, let alone that is was racially discriminatory.

Next, Plaintiffs point to the fact that Edith Stonewalsh was permitted to take the examination late, and argue that this violates civil service rules. This too is unsupported by the evidence. Plaintiffs cite to Civil Service Rule 111A.7.1, but the Rule states only that "applicants must be guided by the terms of the examination announcement." See S.F. Civil Service Rule 111A.7.1. Plaintiffs note that the examination announcement here set the examination date for May 9, 2008, and argue that permitting Stonewalsh to take the examination later was improper. See Ramos Decl. ex. Z. However, nothing in Rule 111A.7.1 forbids the city from making an accommodation. It merely reflects that fact that the City could have insisted on the May 9 date, not that it must insist on it. And there is no

evidence whatsoever that Stonewalsh was granted an accommodation that would not have been extended to a Hispanic employee.

Finally, Plaintiffs argue that MTA's announcements for the 2008 hiring process inappropriately changed the applicable "certification process." First it was "rule of the list," but was later amended to the "rule of the three scores." Plaintiffs contend that, in derogation of both procedures, the Sign Shop inappropriately selected a variety of applicants. The evidence cited simply does not connect any procedural impropriety to any racially discriminatory behavior. First of all, the only citation to City procedural codes is to a Rule applicable only to the Fire Department. There is no apparent reason to apply this rule to MTA. Second, Plaintiffs do not explain or cite evidence explaining what "rule of the list" is, or how it was violated. Third, Plaintiffs cite no authority for the proposition that the City could not change the certification process in advance of the examination. Fourth, Plaintiffs fail to offer evidence showing that "Rule of the Three Scores" indicates that MTA was obligated to hire an individual with a score in the top three. On the contrary, the job announcement states that "The certification rule for the eligible list resulting from this examination will be Rule of the Three Scores. The hiring division may conduct additional selection processes to make final hiring decisions." Ramos Decl. ex. U (emphasis added). No reasonable reading of this announcement suggests that MTA was obligated to hire one of the three highest scoring applicants after the examination.[1] The announcement is clear that MTA "may conduct additional selection processes to make final hiring decisions."

Plaintiffs also entirely ignore the interview with the independent board of interviewers. Defendant has submitted evidence that, after an interview with an independent board, both Padilla and Villalta were unanimously judged to be "well qualified." The successful applicants, however, had at least two interviewers rate them at minimum "best qualified or well qualified." See Fielsted Decl. ex. A. The evidence also suggests that one of the interviewers who rated Stonewalsh above Padilla and Villalta was himself Hispanic.

---

[1] In any event, there is no evidence that Stonewalsh did not, in fact, have one of the three highest scores.

17

Finally, it is undisputed that Supervisor Coe, who made the final decision for the Sign Shop position, concluded that Villalta and Padilla should not be hired because they "had performance records that were problematic." Coe Decl. ¶ 20.

Given this evidence and the applicable legal standard, no reasonable jury could conclude that MTA's stated reasons for not promoting Villalta and Padilla were pretexts.

### 4. Laffey's Comments

Plaintiffs also contend that they had direct evidence of discrimination, as opposed to circumstantial evidence. They argue that they need only present a small amount of direct evidence in order to rebut the City's evidence. While Plaintiffs are correct as to the nature of the McDonnell Douglas standard, they are incorrect as to the definition of "direct evidence."

Plaintiffs cite in part to Lindahl v. Air France, 930 F.2d 1434 (9th Cir. 1991). Lindahl explained that a "plaintiff cannot carry [his] burden simply by restating the prima facie case and expressing an intent to challenge the credibility of the employer's witnesses on cross-examination. She must produce specific facts either directly evidencing a discriminatory motive or showing that the employer's explanation is not credible." Id. at 1438. While Plaintiffs are correct that Lindahl went on to explain that "the plaintiff need produce very little evidence of discriminatory motive to raise a genuine issue of fact," Plaintiffs here fail even to meet this low bar.

This is because Plaintiffs misunderstand the nature of direct evidence of discriminatory motivation; the evidence to which they cite simply is not direct evidence of discriminatory motivation. First, Plaintiffs cite to Laffey's "derogatory comments related to African-Americans." Opp. at 20. Laffey remarked that a lost paycheck had potentially been taken by an African American sign installer, stating "Yeah, you went to go buy another Cadillac with that money or you went to go fix your church." Ramos 2d Decl. ex J. First, the comment is entirely devoid of context, and on its own is extremely weak evidence of Laffey's racial animus. As the Ninth Circuit has held, "'stray' remarks are insufficient to establish discrimination." Merrick v. Farmers Ins. Group, 892 F.2d 1434, 1439 (9th Cir. 1990). Second, not only was this a "stray" remark, Laffey was not even involved in the vast

18

majority of the events complained about by Plaintiffs.  Third, an ambiguously discriminatory remark about one ethnic group does not support a discriminatory bias as to a different ethnic group.  While Plaintiffs are correct that a hostile work environment analysis can take into account hostility that is not directed at a plaintiff, Plaintiffs have not separately articulated a hostile work environment.  See McGinest v. GTE Service Corp., 360 F.3d 1103, 1117 (9th Cir. 2004).  Such a stray comment simply does not directly support the proposition that the Defendant acted out of a discriminatory motive.  As such, it is not direct evidence, and is not sufficient to overcome summary judgment.

Plaintiffs next point to another remark made by Laffey.  According to Gilbert Guerra, Laffey once told him that he would have better luck being promoted if he were Irish.  Ramos 2d Decl. ex. K.  This evidence is similarly unpersuasive.  First, Guerra has abandoned any arguments relating to his failure to be promoted.  Second, as to the promotion at issue in this case, Laffey was not involved in the decision making in any way.  Hence, his alleged racist beliefs in no way impacted Plaintiffs' failure to be promoted.  Third, this is an isolated comment taken entirely out of context.  Such a comment, on its own or in conjunction with the only other questionable statement Plaintiffs can point to, is insufficient to rebut Defendant's showing.

## CONCLUSION

Plaintiffs make a laundry list of allegations.  However, when the evidence is analyzed separately, Plaintiffs fail to make a prima facie case as to some allegations, and as to others fail to rebut Defendant's showing that it acted for legitimate and non-discriminatory reasons.  As to Plaintiff Guerra, there is no evidence that he was subjected to an adverse employment action.  As to Plaintiff Perez, he was fired for well-documented gross misconduct.  Plaintiffs have presented no evidence that the procedure leading up to his termination was in any way inappropriate.  Plaintiff Villalta was not promoted to a surveyor position because a different applicant was rated more highly by an independent and racially diverse interviewing committee, and because he had an extensive disciplinary history.  Plaintiff Padilla was not promoted because he did not rank as highly as the successful candidates, and he was

disciplined because he failed to follow his supervisor's instruction. Plaintiffs' evidence to the contrary is either pure speculation, or is so weak as to fail to rebut the Defendant's evidence under <u>McDonnell Douglas</u>. Summary judgment is therefore GRANTED to Defendant.

**IT IS SO ORDERED.**

Dated: March 31, 2010

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE